The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and this honorable court. Good morning, everyone. We thank you for appearing at this hearing by Zoom. Just as a point of information, this panel has held two days of in-person hearings. And as far as we know, they went splendidly well with appropriate precautions. So you might bear that in mind if you get the opportunity to appear in person. The lawyers who did so seem to appreciate that experience a great deal. And frankly, the panel did as well. But here we are in this weird time. And this is the only way we're moving cases. This is not the only way, but we're moving cases along. I would like to issue a few preliminary reminders. You're not allowed to video, photo, or record this session any more than you would be if we were in New Orleans. I would appreciate if you mute your telephones or any devices you may have in the background. And to assist the orderliness of this presentation, we will give, since you've divided up your arguments, normally we would give each side five minutes running room without asking questions. But since two of you have very short times, I think you'll be open to questions. But I don't think we're going to pester you too much. We will make an effort not to do so. Mr. Plaisance, do you want to have a four-minute uninterrupted argument? Three to four minutes would be fine, Your Honor. I'm prepared either way. Pardon me? Judge Jones, Ms. Goff has disappeared from the screen. I'm not sure. I'm not sure if she got disconnected. Well, I do that sometimes. I just press the wrong thing and then I come back. Hmm, okay. We can give her a second to rejoin or I can call her real quick. Let me try to call her. Anyway, Mr. Pierce, you can have five minutes uninterrupted at the beginning of your presentation. Thank you, Your Honor. And I'll go ahead with the normal rule statements, which are that the timer is going to work as it always works. And a yellow light will come on. You may not be able to see it too well, but it will come on when you have two minutes left. And then when the red light, the timer winds down to zero, we ask you conclude your argument as quickly as possible unless you're answering a question from counsel. We've read the briefs and record excerpts. We have not necessarily read the entire record. So we appreciate your record citations. Okay, I just spoke with her. She said her computer just completely went black. She's rejoining from her iPad right now. Oh, poor thing. All righty. Well, as I said at the beginning, Ms. Goff, your picture is not too clear. So in case there are transmission problems, we'll make every effort not to interrupt much of your presentation. And with that, I call case number 19-30923, United States versus Goodman. Ms. Goff. Shelley Goff on behalf of Brittany Gix. May it please the court, counsel. My client Brittany Gix was convicted of conspiracy to distribute and possess with intent to distribute 50 grams or more of methamphetamine that arrived at her doorstep in a FedEx box that contained inside the FedEx box a gift-wrapped package. The FedEx box was left at her door. The officer who was disguised as a FedEx person left it on the door, knocked on the door, and walked away. This box was sent by Brittany Gix's boyfriend, Mr. Gooden. Mr. Gooden and Ms. Gix had a rocky relationship as could be told by the facts of the text messages that were exchanged between the two. In this case, the government wants Ms. Gix convicted without showing that she knew what was in the box, that she knew that the scope of the conspiracy was 50 grams or more. What they have here is only inferences. Those inferences are based on a fight between her and her boyfriend because she said some things in that fight such as, pardon my French, I'm not going to accept your shit anymore. She had told him to get out. She had told him to come pick up his stuff. She told him she did not want to get this package, but the package was already on the way. Mr. Gooden, in text messages, told her, hey, this package has a gift for my daughter. Um, there is no evidence other than inference that Brittany Gix knew what was in that package. She didn't have a chance to refuse the package. It was left on her doorstep, as I said. She had no way to decline the delivery. Mr. Gooden said, hey, I'm sending you some stuff, but he didn't say, hey, I'm sending you some drugs. Whether or not she knew what was in the box is definitely speculation, and there's no evidence that she knew that the scope of the conspiracy was at least 50 grams or more. It's a leap on both issues as to whether she knew how much there was in the box or what was in the box. The government is trying to tell you that a girlfriend, due to the relationship, should know everything the boyfriend is doing, whether he's doing drugs, if he is, what weight. Whether or not this was actually a gift for the child. Every indication shows that when the officers breached her door and came in, the only package that she had opened was the outer package, and she told him I was just being snoopy. I did not open the interior package. As a matter of fact, she told him, come have your boy come get this because I don't want it. So Mr. Walker apparently came and got the box, but the box, the interior box was never opened by Ms. Gix. The evidence is just not there. There is, of course, you can do circumstantial evidence, but in this case, it's inference upon inference upon inference. The government wants you to believe that she knew based on the fact that she had a relationship with this guy, and that's simply not the case. A relationship alone doesn't do it. Her panic and making false statements to the police afterwards, yes, we would concede that there is some inference that could be raised there, but she still said, hey, I thought that was a birthday present. I thought that was a birthday present. Every indication shows it was probably a birthday present. The FedEx person thought it was a birthday present, the one in California. When it came to the door, she opened it up. It's wrapped up as a birthday present. She didn't open it up. There's simply no evidence that she had knowledge that there was methamphetamine in that box, or if she did, how much it was. There's nothing to show that she ever dealt drugs herself, that she participated in weighing, or packaging, or delivery, or accepting cash. There's no indication anywhere that she had any amounts of cash that would be unusual for a person in her position. They found nothing in her house that would indicate that she was dealing drugs. The only thing- Can I ask a question? If it was a birthday present for the child, then why would your boy, I think that's the term, be picking it up? Wouldn't they leave the present there for the child, or the child open the present? That's the part I don't understand. Right. It's not her child. Okay. It's another child, and so they're going to pick it up to take it to his child. Okay. Yes. I'm sorry. It's okay. It's okay. It's a little confusing. No, it was not her child. It was Mr. Gooden's child from another relationship that Ms. Gicks had no custodial rights, no visitation, as far as I know, and the child was not in the home. There's no evidence that when the last time the child had been in the home. There's even text messages back and forth between Mr. Gooden and Ms. Gicks that, look, I'm not even going to be home. And he's like, well, you've got to be home, you know, and she had a girlfriend over. Why would you have a girlfriend there when I'm trying to deliver something to you? And she's like- Why? Yes, but Ms. Goff, and your time is up, by the way, but unless one of the others has a question, why would she be, why would they be texting frequently about the delivery of this package if it was just a doll in a box, which could be easily left outside as many ordinary packages are? They were still in a relationship. They texted a lot. This was apparently an important package to him. Wasn't that important of a package to her? Wasn't for her, it was a gift for this child. That was her understanding, so. Okay, thank you very much. Thank you, Your Honor. Next, we'll hear from Mr. Winston representing Meiko Walker. Good morning, and may it please the court, Sam Winston, on behalf of Meiko Walker. Your Honors, we raised one single issue of sufficiency of the evidence that there was insufficient evidence to convict Mr. Walker of counts one and two in this case. Obviously, under the sufficiency of evidence standard, we view that evidence in light most favorable to the government,  would any rational trier of fact found, have found that all of the elements of the crimes were proven beyond a reasonable doubt. And it's our contention, Your Honors, that there wasn't sufficient evidence to prove that Mr. Walker knew what was in the box based on the facts that were presented in the case. Specifically, if you look at what the government presented in regards to Mr. Walker, the government discusses that evidence on pages 32 and 33 of their brief, and on pages 1282 to 1287 of the record, they list the activity. And it's basically that Mr. Walker and Mr. Gooden had texted before that Mr. Walker had Mr. Gooden listed in his phone under the nickname Trouble, and that they communicated twice by phone, and then once by text message before Mr. Walker went to go get the package. He didn't open the package. He was interested after he left. Your Honors, it's our contention that based on those facts alone, that's insufficient. And specifically, if you look at the Paul case, which was cited by both parties in the briefs, the question becomes, when you have this situation where someone's present, presence alone is not enough at the scene of criminal activity and association with the other defendants to be sufficient to satisfy this crime. The question becomes, when presence is such that it would be unreasonable for anyone other than a knowledgeable participant to be present, that's when it crosses that threshold. And it's our contention that there are perfectly reasonable explanations for someone who didn't have knowledge to act the way that Mr. Walker did. If a friend asked you to go pick up the package and they call you a couple of times to tell you about when and where to go get it, that doesn't lead anyone to infer beyond a reasonable doubt that they know what's in that package. We don't have specific communications indicating any of the content like we do in some of the other cases. And I would say that if you look at some of the other cases that were cited by both parties, LaChuga and Zamora, each one of those defendants has more incriminating evidence and more circumstantial evidence that points to their knowledge than we have in this case. I forgot, did Mr. Walker make the claim that he was just picking up a baby doll or a doll? I'm unaware, Your Honor. I think that the specifics about his knowledge were not present in the record. I could be wrong about that. Please forgive me. I don't remember who had that specific knowledge. But it's my understanding that, there wasn't the knowledge of the content of their text messages was simply that the FedEx receipt that was sent to him, but we don't have the content of the back and forth that like we had with perhaps the other co-defendant. And of course, that was $100 overnight shipping charge, which exceeds even the price of an American girl doll, in my experience. Right, I think that is certainly a fact that would weigh against some of the other co-defendants. But if Mr. Walker just asked to go pick up that package for a friend, we can't infer that he's supposed to know what's in the package at that point. Yeah, okay. Thank you very much. We hear next from Mr. Plaisance. Good morning, your honors, and may it please the court. Mark Plaisance on behalf of Thomas Gooden. In this case, we present two assignments of error. The first of which involves conduct related to the other two defendants. The second of which involves independent conduct, as Mr. Gooden was traveling from California to Louisiana. I'll start with the latter first. Essentially, our position is this. Mr. Gooden was unconstitutionally detained on the side of the road in excess for more than 20 minutes after issuance of the citation in violation of the United States Supreme Court case in Rodriguez. Rodriguez only allows for detention, for gives an officer time reasonably to complete the mission of issuing the ticket or the mission for which the defendant was stopped. All of the facts of this case indicate that the... First, let me make it clear. We're not challenging the initial stop. We've conceded that the initial stop was proper under Louisiana law. I don't think that is that issue. The only issue is whether or not he was detained or prolonged unconstitutionally thereafter so that the officer could retrieve a canine dog to sniff. The officer interviewed Mr. Gooden for approximately six minutes. The one advantage of this case, there is a videotape that should be in evidence. The officer sat in his vehicle for approximately 13 minutes during which he obviously made various phone calls or radio checks, background checks, and even drew up a search warrant. That adds up to about 20 minutes. At that point, he approached Mr. Gooden. Mr. Gooden declined to sign the search warrant. He issued Mr. Gooden a ticket, and then he engaged in further conversation. And then at that point, after 20 minutes, decided that, oh, I'm going to call a canine unit, which took an additional 20 minutes to arrive at the scene. So the actual dog search did not take place till at least 40 minutes after the initial stop. We believe that this matter is in violation of Rodriguez. In short, before your honors begin with any questions, the second issue involves whether or not the commentary to Article 4B1.2, which defines controlled dangerous substance, includes the commission of a conspiracy. Mr. Gooden was convicted of engaging with Ms. Giggs and Mr. Walker in a conspiracy. It is our position that despite this court's opinion in Lightburn, which I believe closely read is actually dicta, and the Lamb case indicated it may be dicta, therefore this panel can address the case without it having to go to an en banc panel, indicates that the definitions or commentary, as it's called in federal court, cannot supplant the actual rule such that it changes the rule. And the word conspiracy is nowhere to be found in the definition of, in the definition in 4B1.1 under controlled substance. Therefore, it should not be included and the court should not have included that as a prior offense. Now, the fact is, as we sit here currently, the courts around the country are split on this issue. This court's last true case on this seems to be Lightburn from 1997. But in the Lightburn case, this court indicated that it only said the commission was empowered to lawfully include drug conspiracy and then drew the conclusion, perhaps, that it did so. It has subsequently filed that case as precedent and saying it could not, one panel could not reverse that decision. It would need to go to an en banc panel. But in one of the most recent cases, the Lamb case, this court indicates that perhaps the language in Lightburn was dicta. If it in fact is dicta, then this panel certainly has the authority to say it was dicta and rule accordingly. I will bring your attention to two important facts. Number one, the most recent case in the United States on this issue is a case called United States v. Nasser on December 1st. In the sense that your audio's breaking up. Well, the most recent case is what? U.S. v. Nasser, N-A-S-S-I-R. It's 982 Federal 3rd 144 from the Third Circuit. Decided 12-1 of 20. It was an en banc decision. And it said implying that conspiracy is part of the definition of 4B1.2b is an impermissible expansion of agency regulation under the case of Kaiser v. Wilkie decided by the U.S. Supreme Court in 2019. So you're taking issue with the idea that the application note is authoritative. Is that what you're saying? I'm saying it's instructive, but it may be authoritative to the exception that it's not included within the definition. In other words, it's comments. Well, I think that would be about the first time that a court has held that as to the guidelines. So the Third Circuit was certainly breaking ground here. Well, Judge, the Winstead Court from the D.C. Circuit kind of said the same thing that conspiracy or inchoate offenses is not included in 4B1.2b. And it also cited the Haver case from the Sixth Circuit that said the same thing. And in fact, under Burgess v. United States way back in 2008, the court said a rule by definition declares, which declares what a term means, excludes any term that's not included. And conspiracy is certainly not included in the definition itself. It's included in the comments. And here's the bigger point. The current proposed guidelines drawn up by the commission that are pending to be adopted by Congress do now today, the proposed guidelines include the word conspiracy in the definition. So therefore, in my opinion, if so facto, if it's included in the current definition, then the Sentencing Commission realizes it's not part of the current definition as we sit here today. So therefore, the courts cannot use the comments to supplement the definition. Noticing that I have about a minute and a half to go, I'd certainly like to go back to the Rodriguez case. I believe in many ways, it's, I'm not gonna interrupt the court's question if they have another question. But the Rodriguez, go ahead, Judge. If we agreed with you, assuming arguendo, that we agreed with you on that last argument, what result? Well, the result is that, that crime cannot be used to enhance. Now the government says, I thought there were two other crimes waiting in the wings. There are two. I'll acknowledge that from state court. But then if you grant my motion to suppress under Rodriguez, then you've basically done away with the entire case. And then there's no, the two are just two. In other words- Would it just be academic for us to address that issue? If there are these two other crimes, it's really interesting issue. But would it be academic for us to address that? Putting aside the Rodriguez suppression point. Perhaps, but if you granted the Rodriguez, that takes away two of the charges, of the three. So if we don't grant on Rodriguez, it doesn't matter on the guideline commentary issue. Unfortunately, if that's your position, yes, Your Honor, respectfully. I'm not saying that's any position. I understand, but yes, correct. But if you grant under Rodriguez, then you have to at least address it in some form of the way. And it's your position that it's 20 minutes of nothing but waiting for the dogs, right? That's correct. That's all it was. Thank you. All right, sir. Mr. Pierce. Thank you, Your Honors. Good morning and may it please the court. James Pierce for the United States. The defendants trafficked drugs from California to Louisiana. The district court correctly denied good and suppression motion. The sufficient evidence supported Gix's and Walker's convictions. And this court has already decided and need not do so again here, that a drug conspiracy qualifies as a controlled substance offense for purposes of the career offender guideline. Turning first to the suppression question. It's certainly true that the Rodriguez case holds that a traffic related stop must last no longer than the traffic purpose. But it carves out the, unless reasonable suspicion develops over the course of that stop. And here reasonable suspicion developed almost from the very moment the stop happened. Gooden got out of his car. Officer Dickerson testified that that alone caused the hair on the back of his neck to rise. Gooden said that the itinerary that he gave was implausible, if not impossible. He was driving a California car in someone else's name with suspended registration. Gooden said he was a lifelong California resident, but then had a Louisiana ID. And when asked about that, said, quote, it was good to have, unquote. All of these things created reasonable suspicion. In addition, there were discrepancies. And I'm putting aside the fictitious ID because the officer didn't know that on the ground. But there was a difference between the height listed on the fake ID. And then there was a difference between the criminal history that was associated with the fake individuals, with the fake individual and the actual response that Gooden gave. So there were 15 or so convictions for battery and drug convictions and burglary. And Gooden, when asked, said, I just do a couple of bar fights. So all of that created reasonable suspicion. Once there's reasonable suspicion, the officers are allowed a reasonable amount of time. This is not governed by Rodriguez to either confirm or dispel that reasonable suspicion. And the 20 minutes or so that it took to get the dog on the scene to perform the search, sorry, to perform the sniff falls well within that. Certainly, I didn't hear my friend on the other side identify any cases that deal with that particular question. Now, turning to sufficiency, as to Ms. Gicks, there's ample communication that establishes the close nature of their relationship. The jury could infer from that that these would be individuals which trust each other with drug-related information. The idea that this was a birthday present or specifically a baby doll, certainly that's what Gooden tells the person out in California. Ms. Gicks never says it's a doll. If anything, Ms. Gicks dissembles, she first says it's from a Tyrone Gicks, then a Tyrone Johnson. And this idea that she didn't know it was coming or she wanted to reject it, she had given Gooden the address the day before. And if she wants to reject the package, why does she pick it up, take it into her closet and open it? That doesn't sound like the kind of actions that would reject a package. And I heard Ms. Gicks' attorney say that she had just said, I'm sick and tired of your S-word. What she actually said is, I am not gonna, once I take all this S-word this time, don't send me any more. And I think that's an important difference, right? I mean, that recognizes that I'm talking about a specific thing. This S-word doesn't sound like the kind of way you would describe a doll or a present. I think a jury could fairly infer from that that we are talking about controlled substance, about methamphetamine. And so the receipt as well, which Judge Jones referred to, both Gicks and then Walker as well, received the receipt and saw that this was $100 overnight shipment. Again, I think the jury can fairly infer from that, that this is methamphetamine and quite a large amount of it. And in terms of the amount, the 450 grams that were ultimately found when the package was intercepted at the FedEx facility was nine times the 50 gram threshold to kick in the penalty and support the conviction as well. Before my unquestioned time elapses, I just wanna quickly address, and of course then welcome the court's questions, the sentencing issue. This is purely academic, as Judge Elrod said. There are two convictions, substantive convictions that have nothing to do with the conspiracy. The prior convictions are not, the prior convictions are from much earlier 2003, 2004 cases. And so this court need not address the conspiracy question. And even if it did, it's bound by the Lightborn decision. The notion... Well, you're off your time limits now. Certainly. Has the DOJ adopted any position? I had thought that the general rule was, I know in our court and many, I thought in many others, was that application notes are definitive, are authoritative, and we've enforced them. Has DOJ taken any position on that in light of cases like Kaiser? So our position continues to be that in line with the Supreme Court's decision in Stinson, that an application note is authoritative so long as it is not inconsistent with, or a plainly erroneous reading of the text of a guideline. And we have, post-Kaiser, we have continued to argue,  my friend on the other side is correct, but we have continued to argue that the text faithfully incorporates the application note. One way, I think, to perhaps the best articulation of our position in another case is the court's decision is the Lange decision cited in our brief. It's an 11th Circuit opinion that says the use of the word prohibit in the text of the guideline is fairly construed broadly to then sort of incorporate or encompass inquit offenses as the guideline commentary makes clear. Again, this is all academic. There's no reason, both because there are other substantive convictions, but also because Lightborne is binding. And this court's unpublished decision this year in Tam, which doesn't address the dicta at all, it just says on plain error review, we're not going to consider it. That doesn't somehow open the door to say that this is open to this panel. Maybe this panel wants to take it en banc, but certainly that's not, I mean, not this panel, but maybe the court decides that, but that's not a question for the panel today. But you think it's a bad case for us to do that? I want to make clear, we think we're right on the issue, but I also think there's a vehicle problem that this wouldn't be the right case to bring that to en banc consideration. You mentioned that the weight was 10 times the required 50 grams. What is the established case law, if there is any, as to whether that's an element in any event? If I understand your question, Judge Smith, are you saying what's the case law that the amount or the... Let me put it... The knowledge of the amount or the reasonable knowledge of the amount. Well, the district court's instructions here, and I believe this is at ROA 471, charged the jury with respects to the conspiracy that the defendants had to know or reasonably should have known the amount of the drugs, the 50 grams of methamphetamine. Candidly, I'm not sure that that's an entirely accurate recital of what the elements are. And so if this court were to decide, and I think the Musacchio case, the Supreme Court's Musacchio case makes clear that the elements as set out in the jury instructions aren't the ultimate question. The elements are what the elements are legally. That if it's just within the scope of the conspiracy, then Ms. Goff's knowledge doesn't matter. Now, again, I acknowledge we didn't press that argument in our brief, and we draw on facts, specifically the amount, the receipt, and then Judge Smith, as you said, the amount of the drugs, nine times the threshold are sufficient to establish, particularly on sufficiency review, that she knew that there were at least 50 grams of methamphetamine. But again, I'm not entirely sure that that's what was required, but that's how the jury was charged in this case. Mr. Pierce, I don't, what did you argue if you did about sufficiency as regards Winston, I'm sorry, Walker? So we certainly did argue that the sufficiency as to Walker was similar in nature to that, as to Ms. Gicks, it was the nature of the communication. Did they have a romantic relationship? No, to be clearer, the nature of the communications between them. So the delivery happens in October of 2017. In August of 2017, Gooden reaches out to Walker and says, here's my new line, here's my new way of communicating with you. 45 minutes before the package delivery happens, the two have a phone call and speak for about five minutes. 11 minutes after that, they have another phone call and speak for about a minute and a half. Gooden then texts Walker the same FedEx receipt and manifest that he has already texted to Gicks. In other words, here's the really expensive overnight shipment that you should be looking out for. And then there's also the communication that I believe the attorney for Ms. Goff mentioned this, that Ms., the attorney, sorry, for Ms. Gicks mentioned this, that Gicks in her communications with Gooden says, you know, just have your boy come and pick this up, right? And lo and behold, Walker shows up a few minutes later to come pick up the package. And so the inference there is that Gicks is aware of the plan, Walker is aware of the plan. This is not just people randomly showing up, you know, all at the same site at the same time. Counsel, when is it that you believe there was the reasonable suspicion to support the search, the continued detention with the drug dogs? Because obviously it appears to be at the timing when the refusal of the consent to search would seem to have triggered that. And obviously that's not a legitimate reason to trigger that. So certainly that refusal to search is not a legitimate reason. It wasn't considered as such by the court below. We didn't argue that in our brief. To more directly answer your question, I think at least by the time that the officer notices the height discrepancy, right? So even before he goes back to the vehicle, because at that point, Gooden has gotten out of the car. He's given this implausible, I'm sorry, did you have a follow-up, Judge Ella? No, I said bless you to Judge Jones. I apologize. I'm sorry. Gooden has gotten out of the car. There's the impossible itinerary. There's this very strange statement about I just wanted to have a Louisiana ID. There's the recognition that it's a suspended California registration in someone else's name. All of that supplies the reasonable suspicion. Then when you add into it, and in our view, this is still part of the traffic stuff, the discrepancy between the stated, the actual criminal history of whatever the fake ID name is, I think it's Malkia Dussart or something. And then when the officer goes back and says, hey, do you have any criminal history? Gooden says, oh, a couple of bar fights, right? In our view, that's all, reasonable suspicion is well established there. But even before that, there's adequate justification to conclude there's criminal activity afoot and a dog sniff is permissible to go ahead and confirm or dispel such suspicion. Well, then why was there the delay in asking for it? I mean, why wasn't he calling for it earlier if it's already so clear? I mean, I guess you did wait until the time where he went back to ask him about his criminal history. And so then it would be go back to the car again. And so it seems like if he knew earlier, then why did he wait? Well, so I think that there's a quite straightforward answer to that question, which is the officer interacts with Gooden. He goes back to his vehicle and he does three different things. He runs Duzart's criminal history, he writes out a traffic citation and he drafts, I think Mr. Pleasant referred to it as search warrant. He drafts a consent to search, right? He then goes back to Gooden. If Gooden says, hey, go ahead, search my vehicle, no problem. There's no reason to call a dog to come and do a sniff and then possibly establish probable cause to get into the vehicle. If he consents then and there, fine. The search can happen. If he doesn't, which he doesn't, okay. Then your backup is let's kick in motion, the call to the dog, the dog then arrives, the dog does the sniff, then there's PC to get in the car. So it's, why have all of that other stuff if Gooden is gonna just consent to the car, to the search itself? Okay. If there are no further questions, I would ask the court to affirm. I think there are none, thank you. Thank you, Your Honor. Mr. Pleasant's rebuttal. Yes, ma'am. Judge Alright, I think you hit the nail on the head. If the trooper believed that there was reasonable suspicion or probable cause, myself and the state, the government sort of dispute which terminology we'd use in that case, then he had adequate time to call for the dog prior to coming back to Mr. Gooden the second time. As the facts in the dash cam indicate, they spoke for six minutes, then he went in the car and took 13 minutes to prepare various documents. Why didn't he call for the dog during those 13 minutes? He knew plenty, allegedly based on what the state says. I mean, the government says, I'm sorry, I'm used to doing state court cases. And under this court's decision in Brigham, it says the traffic stop ends when the ticket is issued. So when he comes back out of the vehicle, if he had concerns that Mr. Gooden was not being truthful, then perhaps he could have engaged in further conversation, which he did, but he issued him the ticket. So when he gave him the ticket, by law, Mr. Gooden was free to leave. The stop was completed. There was no further grounds to detain him. Mr. Gooden didn't take any evasive action, didn't try to push the cop, didn't run, didn't do anything. The officer said, here's your ticket. Oh, and by the way, and when you get into the, oh, and why, and by the way, that's when officers start illegally detaining. My friend for the government says we cited no cases, but if you look at our reply brief, one case, albeit from a district court in Louisiana, federal district court, U.S. versus Bell, Brayboy, on page 16 of my reply brief, it's virtually identical, same area, same interstate, virtually same facts, argument about nervousness, vehicle registered to third party, inconsistent itinerary, and the district court suppressed citing this court's case in Spears. And in Spears, this court said that placing the defendant in the back of the vehicle when it took 23 and a half more minutes for the dog to arrive, just prolonged the detention and violated the fourth amendment. So to wrap it up real quick, the second argument concerning the conspiracy issue is not academic because I'm going to assume that the court would find enough reasons to suppress. So if you do that, you knock out two of the three current convictions. All what's left is the one with the conspiracy with the two priors from 03-04. I don't dispute the 03-04s. Then you stuck with the one for conspiracy and the two older ones. So you have to at least address however you're going to address the conspiracy argument and I think that it's prime. Light burn does not prohibit this court. I'm sorry, go ahead Judge Jones. I'm sorry. Well, his time is well elapsed. Do you have a question? I do have a question. The fact that the district court could have ruled to suppress given that the totality of the circumstances and did so in another case doesn't mean that we would reverse a determination, does it? I mean, this might be in that gray area that could have gone either way and it would be upheld either way. Is that not true? And that is correct. I mean, I think the court even struggled in this case. Correct me if I'm wrong but I believe the magistrate's recommendation even indicated it was a closed call but I don't believe it's that close because this court said in Jones in 2000 that even a trivial delay of three minutes was too long. So you have a series of cases from this court. You have Rodriguez and you really don't... To wrap it up, if the officer would have learned or engaged in conversation regarding past criminal behavior and felt necessary to call a dog before giving the ticket, my friend on the other side, I think his argument would be a lot stronger in my position and mine would be weaker. But once he gave him the ticket on your bigum, that's it. Tout fini, as they say in French. And I'll stop at that. You are fini. Okay, this concludes this argument. I would particularly thank Ms. Gotham, Mr. Winston. As court appointed attorneys, we very much appreciate the work you put in in preparing for your arguments, which were very good. And with that, you're all dismissed. Thank you. Thank you. Thank you, your honor.